# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JASON R. MUCHA,**
          **Plaintiff,**

v.                                         Case No. 14-C-0303

**CITY OF MILWAUKEE, et al.,**
          **Defendants.**

---

## DECISION AND ORDER

Jason Mucha has filed a complaint against the City of Milwaukee, one of its agencies, and three of its officials. He alleges claims under 42 U.S.C. § 1983 and state law. Before me now is the defendants' motion for judgment on the pleadings.[1]

### I. BACKGROUND

The following facts are taken from the plaintiff's complaint and the exhibits the defendants have submitted in support of their motion. Those exhibits are referred to in the complaint, are central to the plaintiff's claims, and are concededly authentic; therefore, I may consider them without treating the motion for judgment on the pleadings as one for summary judgment. See, e.g., Hecker v. Deere & Co., 556 F.3d 575, 582 (7th Cir. 2009).

During the time period at issue in the complaint, Mucha was a sergeant in the Milwaukee Police Department. In 2012, Mucha submitted an application for disability

---

[1] The defendants filed motions to seal certain materials supporting their request for judgment on the pleadings. The materials they seek to seal relate to the plaintiff's mental-health records, and the defendants are concerned that the plaintiff may object to having those records made available to the public. However, the plaintiff has responded to the motions to seal and indicates that he does not want the materials sealed. See ECF No. 28. Therefore, the defendants' motions to seal will be denied.

benefits to the City of Milwaukee Employe's Retirement System ("ERS"), claiming that work-related stress prevented him from continuing to serve as a police officer. As part of its investigation into whether Mucha qualified for disability benefits, ERS had Mucha evaluated by a psychiatrist, Dr. Donald Feinsilver. The evaluation took place on October 17, 2012. On November 5, 2012, Dr. Feinsilver sent a six-page report concerning Mucha to defendant Bernard Allen, the Executive Director of the ERS.

At 5:00 p.m. on November 20, 2012, Allen faxed a heavily redacted copy of Dr. Feinsilver's report to someone named Mary Hoerig at the Milwaukee Police Department. The date of the report was visible, but almost the entire body of the report was redacted. Only four separate paragraphs of the body were visible, and each visible paragraph was surrounded by approximately one page of white space. The visible paragraphs stated as follows:

> He then was speaking spontaneously as he said, "I have had thoughts of suicide. I have had thoughts of suicide by cop. I don't want to kill myself." He then spoke completely spontaneously, saying, "I think of going to a command staff meeting with a rifle, shooting them until they shoot me." He did add, "I am not intending to do that."
>
> . . . .
>
> He told me that he owns "over ten guns." This included some rifles, such as an M-14. Another time, he spoke about "twenty two rifles." He has a "couple of Glocks" that he uses for target shooting and a "380 for carrying off duty." He does not typically carry this around the street, yet he did get a CCW license.
>
> . . . .
>
> Toward the end of the evaluation, when I asked Jason Mucha whether there was anything else that he wished to bring to my attention, he said, "I just can't go back [to work]. I can't take a chance of them trying to get me. It could have a real bad ending." When I asked to what he was referring, he said, "Kill myself or them."

2

> . . . .
>
> 3) However, Jason Mucha is, in a not very veiled manner, threatening to shoot people in police command. He has a considerable stash of firearms. Hearing this, I cannot send him back to work. This is a public-safety issue.

Russell Decl. Ex. A.

The complaint alleges that upon receipt of the redacted report, the Milwaukee Police Department dispatched officers assigned to its tactical-enforcement unit to Mucha's residence. Defendants Jutiki Jackson and Donald Gaglione were among the officers who arrived at Mucha's house on November 20th. After speaking briefly with Mucha, Jackson and Gaglione decided to detain him against his will and transport him to the county mental-health facility pursuant to Wisconsin's "emergency detention" law, Wis. Stat. § 51.15. Under that law, as is relevant here, a law-enforcement officer may take a person into custody if the officer has cause to believe that the individual is mentally ill and that the individual poses a substantial probability of physical harm to himself or others. See Wis. Stat. § 51.15(1)(ar).

After taking Mucha into custody, Jackson and Gaglione prepared a "statement of emergency detention." In that statement, the officers wrote that, on November 5, 2012, Mucha engaged in "dangerous behavior" at the offices of Dr. Feinsilver. Russell Decl. Ex. B. The officers described the dangerous behavior as follows:

> On Monday, November 5, 2012, Dr. Feinsilver conducted an interview of Jason Mucha for the purpose of a mental health evaluation. During the interview Mucha made several statements of suicidal thoughts, as well as statements of shooting members of the Police Department. Jason Mucha specifically stated that he has had thoughts of suicide by cop. Mucha stated that he would go to a command staff meeting with a rifle, shooting them until they shoot me. Mucha further stated in the interview that "I just can't go back to work. I can't take a chance of them trying to get me. It could have a real

3

> bad ending." Mucha stated that he has the means to carry out the thought, because he has many guns at home.
>
> Dr. Feinsilver passed the information to the Milwaukee Police Department and I, Lt. Jackson [sic] followed up on the investigation. Upon going to Mucha's home and speaking with him, he stated "the thoughts of suicide and hurting others were only dreams," and that he does not have any intent on hurting himself or anyone else. Mucha was then conveyed to Mental Health.

Id.

Upon Mucha's arrival at the mental-health facility, a physician examined him and determined that he met the criteria for emergency detention. Mucha remained in the custody of the facility for approximately three days—from late Tuesday night until Friday. The intermediate Thursday was Thanksgiving. On Friday, Mucha was examined by another physician, and this physician determined that there was no basis for further detention and ordered Mucha's release.

In the present action, Mucha claims that defendants Jackson and Gaglione violated his federal right to be free from unreasonable seizures when they took him into custody under the emergency-detention law. He seeks to hold Jackson and Gaglione liable for this violation in their personal capacities and also claims that the City of Milwaukee is liable for the unlawful seizure and the false imprisonment that followed the seizure. Mucha also brings several claims against the ERS and its executive director, Bernard Allen, based on Allen's disclosing Dr. Feinsilver's report to the police department. Mucha alleges that Allen initiated the sequence of events that resulted in the emergency detention "for the purpose of punishing and discrediting Mucha to gain a position to deny his duty-disability benefit application." Compl. at 2. Mucha alleges that the disclosure of the report violated Wisconsin's mental-health records privacy law, Wis. Stat. § 51.30, constituted abuse of

4

process, and somehow deprived Mucha of his federal right to procedural due process. The defendants have moved for judgment on the pleadings as to all claims.

## II. DISCUSSION

### A. Claim for unreasonable seizure against Jackson and Gaglione

Jackson and Gaglione do not dispute that the complaint states a claim against them for unreasonable seizure. However, they seek dismissal of this claim on the basis of their affirmative defense of qualified immunity. The defense of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 817–18 (1982). To prove that a right was clearly established, the plaintiff must show that the unlawfulness of the defendant's conduct was apparent in light of preexisting law. Anderson v. Creighton, 483 U.S. 635, 639–40 (1987). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Purtell v. Mason, 527 F.3d 615, 621 (7th Cir. 2008) (internal quotation marks omitted). So long as officers of "reasonable competence" could disagree on whether the conduct at issue violated the plaintiff's rights, immunity must be recognized. See Malley v. Briggs, 475 U.S. 335, 341 (1986).

At the time Jackson and Gaglione seized Mucha, it was clearly established under federal law that they could do so "only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard," which in this case is the standard set forth in § 51.15(1)(ar). Villanova v. Abrams, 972 F.2d 792, 795 (7th Cir.

1992); accord Fitzgerald v. Santoro, 707 F.3d 725, 732 (7th Cir. 2013). Under § 51.15(1)(ar), as applied to this case, Mucha was subject to detention only if there was cause to believe (a) that he was mentally ill, and (b) he evidenced "a substantial probability of physical harm" to himself or to other persons "as manifested by evidence of recent threats of or attempts at" suicide or harm to others.

Here, Jackson and Gaglione contend that they had probable cause to detain Mucha because they received information that Mucha had been having "thoughts" of committing suicide by cop and shooting individuals at a police command meeting, and because Mucha had weapons at his home that he could have used to shoot police officers. However, § 51.15(1)(ar) does not authorize the emergency detention of a person based on "thoughts" of suicide or harming others. Rather, emergency detention is authorized only if the person either <u>attempts</u> suicide or to harm others or <u>threatens</u> suicide or to harm others. The defendants were concededly unaware of any attempts to do such things, but they argue that they had evidence that Mucha had threatened suicide and to shoot other police officers. However, the evidence in the defendants' possession at the time of the seizure did not support the conclusion that Mucha had made a recent threat to kill himself or other officers. Rather, the only evidence in the defendants' possession—i.e., Dr. Feinsilver's redacted report and Mucha's own statement to the officers—made clear that Mucha had no intent to kill himself or other officers. Mucha himself told the officers that he did not intend to hurt himself or anyone else. Feinsilver reported that although Mucha stated that he had thoughts of killing himself and other officers, he also stated that he was not intending to do either of those things. Feinsilver's report stated that Mucha was concerned that <u>if he was forced to return to work</u>, he might try to harm himself or others.

6

But at the time of the seizure, Mucha was on leave from the police department awaiting a determination of whether he qualified for duty disability. His return to work was not imminent. Nothing Mucha said to the officers and nothing in Dr. Feinsilver's report could be construed as a threat to kill himself or other officers while he was on leave from the police department, as he was at the time of the seizure.

What's more, there was a substantial lapse of time between when the police officers thought Mucha conveyed his thoughts of suicide by cop to Dr. Feinsilver and the date of the seizure. Mucha conveyed his thoughts to Dr. Feinsilver on October 17, 2012. However, Dr. Feinsilver's report was dated November 5, 2012, and apparently for this reason, the officers concluded that Mucha actually made the statements on that date. But the officers did not seize Mucha until November 20, 2012—fifteen days later. Assuming for the sake of argument that Mucha's having conveyed thoughts of suicide by cop could reasonably be construed as a threat to commit suicide by cop (but as I have already explained, it could not be), that threat was stale by the time the officers acted upon it; there was no "recent" threat of self-harm or harm to others, as required by § 51.15(1)(ar). When the officers interviewed Mucha at his home, he was not behaving erratically or engaging in any other conduct that indicated he needed emergency treatment or was likely to embark on a killing spree. To the contrary, he explained to Jackson and Gaglione that the statements he made weeks earlier to Dr. Feinsilver in a private session about suicide by cop "were only dreams." Russell Decl. Ex. B at 2. He further explained that "he does not have any intent on hurting himself or anyone else." Id. Inexplicably, Jackson and Gaglione nonetheless concluded that there was a substantial probability that Mucha would harm

7

himself or other police officers if he was not immediately taken into custody. There was simply no reasonable basis for this conclusion.

Thus, as far as the allegations of the complaint reveal, Jackson and Gaglione lacked probable cause to believe that Mucha was subject to emergency detention under § 51.15(1)(ar). Moreover, assuming that the allegations of the complaint are true, no reasonable officer in the position of Jackson and Gaglione could have thought he had probable cause to believe that Mucha satisfied the standard of § 51.15(1)(ar). As noted, the standard requires a recent threat or attempt to do harm, yet under the facts known to Jackson and Gaglione, Mucha had made no threats or attempts at any time. Even if Mucha's statements to Feinsilver could reasonably be construed as threats (and they could not be), by the time the officers seized Mucha those threats were no longer "recent." Moreover, at the time of the seizure, Mucha was behaving rationally, displayed no signs of mental illness, and engaged in no conduct that could be construed as posing a threat to himself or others. For these reasons, Jackson and Gaglione are not entitled to qualified immunity.

The officers point out that after they seized Mucha and conveyed him to the mental-health facility, a physician examined him and independently determined that he met the standard for emergency detention. However, the physician's determination is irrelevant to the question of whether the officers had probable cause at the time of the seizure. The physician made his determination after the seizure was complete; that determination could have been based on facts that the physician learned during his own examination of Mucha. Those facts would have been unknown to Jackson and Gaglione at the time of the seizure and therefore could not have supplied probable cause for the seizure. See Villanova, 972

F.2d at 799 ("what an arresting officer does not know is inadmissible to show that he had probable cause for the arrest—otherwise hindsight would validate every arrest of a person who turned out to be a criminal").

The officers also argue that the case of Sutterfield v. City of Milwaukee, 751 F.3d 542 (7th Cir. 2012), compels the conclusion that they are entitled to qualified immunity. That case, like this one, involved an emergency detention under § 51.15. Unlike this case, however, Sutterfield did not involve a claim that police officers had seized the plaintiff without probable cause to believe that the standard of § 51.15 had been met. Although the plaintiff in that case attempted to raise a challenge to her detention pursuant to § 51.15, the court held that she had not adequately developed her claim. Id. at 552–53. Moreover, the claim that the plaintiff had tried to develop was not a claim alleging that the officers who seized her lacked probable cause to do so; rather, she challenged the constitutionality of § 51.15 itself—she argued that it was contrary to the Fourth Amendment to allow officers to seize a person without first obtaining judicial approval. Id. The plaintiff did not even attempt to argue that the officers did not have probable cause to believe that she met the standard of § 51.15. Id. at 552 (stating that the plaintiff did not dispute that "there was a valid basis to pursue an emergency detention of [the plaintiff] under section 51.15, that the police complied with the requirements of that statute, or that the statute . . . authorized the seizure of the [plaintiff]"). Thus, nothing in Sutterfield has any bearing on the issues raised in this case.[2]

---

[2] I also note that the plaintiff in Sutterfield, unlike Mucha, had made a recent threat to harm herself. Specifically, the plaintiff's psychiatrist informed the police that the plaintiff had received some bad news and had just left her office after stating "I guess I'll go home and blow my brains out." 751 F.3d at 545. The psychiatrist also informed the police that

9

Finally, Jackson and Gaglione point out that Mucha has cited no case holding that a seizure under the circumstances alleged in the complaint is unlawful. It is true that Mucha has cited no case holding that an officer violates the Fourth Amendment when he seizes a person pursuant to § 51.15(1)(ar) under the facts alleged in the complaint. But to defeat the officers' claim of qualified immunity, Mucha is not required to point to a case involving the precise facts at issue in this suit. "[T]he law of qualified immunity does not require a plaintiff to produce a case that is 'directly on point' in order to show that a right is clearly established." Kiddy-Brown v. Blagojevich, 408 F.3d 346, (7th Cir. 2005). "The question is whether a reasonable state actor would have known that his actions, viewed in the light of the law at the time, were unlawful." Id. (internal quotation marks omitted). And as I have already explained, at the time of Jackson and Gaglione's actions, a reasonable officer would have known that he could not lawfully seize a person under § 51.15 without probable cause to believe that the requirements of § 51.15(1)(ar) were met. Moreover, it is clear that § 51.15(1)(ar) requires the potential detainee to have made a recent attempt to harm himself or others or a recent threat to harm himself or others. Finally, under the facts known to Jackson and Gaglione at the time of the seizure, no reasonable officer could have thought that Mucha had made a recent attempt or threat that gave rise to a substantial probability that he was about to harm himself or others. Thus, despite the lack of a case directly on point, Jackson and Gaglione are not entitled to qualified immunity.

---

she was concerned for the plaintiff's safety and that she believed that police intervention was warranted. Id. In contrast, in the present case, Mucha made no similar statements to Feinsilver, Feinsilver expressed no concerns at all to the police, and the statements Mucha did make to Feinsilver were made fifteen days prior to the seizure.

B.  **Claims for unreasonable seizure and false imprisonment against the City of Milwaukee**

Mucha brings a claim against the City of Milwaukee under § 1983, alleging that it is liable for the unreasonable seizure that occurred when Jackson and Gaglione took him into custody. Under Monell v. Department of Social Services, 436 U.S. 658, 690 (1978), municipalities and other local governmental units are "among those persons to whom § 1983 applies." However, a municipality "cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." Id. at 691. Rather, municipal governments are liable only when their officers inflict an injury in the execution of the government's policy or custom, "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Id. at 694.

To establish an official policy or custom, the plaintiff must show that his constitutional injury was caused by (1) the enforcement of an express policy of the municipality, (2) a widespread practice that is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) a person with final policymaking authority. Wragg v. Vill. of Thornton, 604 F.3d 464, 467 (7th Cir. 2010). Here, the plaintiff concedes that his unreasonable seizure was not caused by either an express policy or a widespread practice. However, he contends that the decision to detain him was made by a person with final policymaking authority.

Jackson and Gaglione decided to take Mucha into custody after they arrived at his home and interviewed him. The plaintiff does not contend that either Jackson or Gaglione had final policymaking authority for the City of Milwaukee on the question of when an

11

individual may be taken into custody under § 51.15. However, the plaintiff contends that one allegation in the complaint supports the conclusion that someone other than Jackson or Gaglione made the decision to detain him. Specifically, he points out that he has alleged that Jackson and Gaglione "were dispatched" to his residence "for the purpose of seeking Mucha's detention for an involuntary emergency mental observation." Compl. ¶ 13. Apparently, Mucha believes he has alleged that someone <u>ordered</u> Jackson and Gaglione to detain him before they even arrived at his residence. However, even if that were so, the complaint does not identify the person who gave the order to detain him or allege that that person had final policymaking authority for the City of Milwaukee. The complaint does not, for example, allege that the Chief of Police gave the order to detain Mucha. Therefore, Mucha's claim for unreasonable seizure against the City will be dismissed.

Mucha also alleges that the City of Milwaukee is liable for the state-law tort of false imprisonment. However, false imprisonment is an intentional tort, and under state law a municipality is not liable for the intentional torts of its agents. Wis. Stat. § 893.80(4); <u>Sell v. Thompson & Coates, Ltd.</u>, 163 Wis.2d 765, 774 (1991). Therefore, Mucha's claim against the City for false imprisonment will be dismissed.

**C.     Claims against Bernard Allen and the ERS**

The plaintiff brings several claims based on Bernard Allen's decision to release Dr. Feinsilver's report to the Milwaukee Police Department. First, he alleges that the release of the report violated his federal right to procedural due process. Second, he alleges that the release of the report violated Wisconsin's mental-health records disclosure law, Wis.

Stat. § 51.30.  Third, he alleges that when the ERS released the report it committed the state-law tort of abuse of process.

### 1. Claim for violation of procedural due process

Mucha has not cited any federal cases suggesting that the release of the report violated his federal right to procedural due process.  However, Allen and the ERS have not moved to dismiss the federal claim on the ground that the release of the report did not violate any of Mucha's federally protected rights.  Instead, Allen moves for judgment on the pleadings on the basis of the defense of qualified immunity, and the ERS seeks dismissal of the claim on the ground that Allen was not a final policymaker and therefore his actions cannot form the basis for § 1983 liability against the ERS, which is a municipal agency.

Allen is entitled to qualified immunity.  The plaintiff has cited no case suggesting that the unauthorized disclosure of a medical record could result in a violation of federal law.  Thus, even assuming that such a disclosure could violate federal law, the plaintiff has failed to show that that law was clearly established.  Harlow, 457 U.S. at 817–18.

However, the complaint alleges enough to state a claim for Monell liability against the ERS.  This is so because the complaint alleges that Allen made the decision to release the report and that Allen is a person with final policymaking authority.  The complaint alleges that Allen is the Executive Director of the ERS and that his responsibilities include "overseeing the proper disclosure of all records."  Compl. ¶ 7.  It is plausible to infer from these allegations that Allen is the ERS's policymaker when it comes to deciding when medical records in the possession of the ERS will be disclosed to third parties.  He was "at the apex of authority for the action in question."  Vodak v. City of Chicago, 639 F.3d 738, 748 (7th Cir. 2011) (internal quotation marks omitted).

The defendants contend that Allen was not a final policymaker because "the general administration and responsibility for" the ERS is vested in the City of Milwaukee's Annuity and Pension Board, see City of Milwaukee Charter § 36-15.1, and it is the Board that appoints the Executive Director, see id. § 36-15.7. However, although the Board appears to be generally in charge of setting policy for the ERS, this does not mean that others within the ERS cannot also be final policymakers in some areas. See Vodak, 639 F.3d at 748–49. And so far as appears from the face of the complaint in this case, the Board has not set any policy regarding when medical records in the possession of the ERS can be released to third parties. Rather, it seems to have allowed Allen, as the Executive Director of the agency, to decide when a record must be kept private and when circumstances justify its release.

The defendants point out that the Annuity and Pension Board retains the power to adopt "rules and regulations" governing the conduct of the ERS's business. See City of Milwaukee Charter § 36-15.6. But the defendants have not pointed to any rule or regulation enacted by the Board that would apply to the situation alleged in the complaint. Nor have they suggested that Allen had to seek Board approval before releasing Dr. Feinsilver's report to the police department. So although the Board could have constrained Allen's authority to release medical records to third parties, it did not do so, "and thus it has allowed him to be the sole policymaker in relation to the events at issue in this case." Vodak, 639 F.3d at 748. Or at least it is plausible to infer from the allegations of the complaint that the Board has allowed Allen to be the sole policymaker in this area, which means that Mucha is entitled to proceed to discovery on the question of whether Allen is

in fact the sole policymaker in this area. See, e.g., Ashford v. Iqbal, 556 U.S. 662, 678 (2009).

### 2. Wis. Stat. § 51.30 claim against the ERS

Mucha alleges that the ERS violated Wisconsin's mental-health records privacy law, Wis. Stat. § 51.30, when Allen disclosed Dr. Feinsilver's report to the police department.[3] The ERS moves for judgment on this claim on the ground that Mucha has failed to comply with Wisconsin's notice-of-claim statute, Wis. Stat. § 893.80(1d).[4]

Section 893.80(1d) requires a plaintiff to serve two types of notices on governmental entities and their officials, agents or employees before filing a lawsuit against them: (1) "written notice of the circumstances of the claim," Wis. Stat. § 893.80(1d)(a), and (2) a claim containing "an itemized statement of the relief sought," id. § 893.80(1d)(b). State Dep't of Natural Res. v. City of Waukesha, 184 Wis. 2d 178, 196-97 (1994) ("DNR"), overruled on other grounds by State ex rel. Auchinleck v. Town of LaGrange, 200 Wis. 2d 585 (1996). The statute requires the notice of circumstances to be filed within 120 days after the happening of the event but imposes no time limit on the filing of the itemized statement of relief sought. Figgs v. City of Milwaukee, 121 Wis. 2d 44, 50 (1984). Further,

---

[3]Mucha brings his § 51.30 claim against the ERS only; he does not also bring that claim against Allen. See Pl.'s Br. at 25–26.

[4]To resolve the question of whether Mucha's § 51.30 claim is barred by the notice-of-claim statute, I must consider matters outside the pleadings, as the complaint contains no allegations concerning whether Mucha complied with the statute. However, neither party has objected to my considering such matters. Therefore, I will consider the matters and will treat the motion for judgment on the pleadings as one for summary judgment insofar as it pertains to the notice-of-claim defense. See Fed. R. Civ. P. 12(d).

15

"only substantial, and not strict, compliance with the notice statutes is required." Thorp v. Town of Lebanon, 235 Wis. 2d 610, 629 & n.10 (2000).

Mucha contends that he complied with § 893.80(1d) because the attorney who represented him in connection with his claim for disability benefits, John Fuchs, sent two letters that satisfied the requirements of that statute. First, on January 17, 2013—which was within the 120-day period for providing the notice required by § 893.80(1d)(a)—Fuchs sent a letter to Allen in which he notified the ERS that its disclosure of Feinsilver's report to the police department violated Wis. Stat. § 51.30. See Mucha Aff. Ex A. The defendants do not dispute that this letter satisfied the requirements of § 893.80(1d)(a). See Reply Br. at 15 n.18.

Second, on July 23, 2013, Fuchs sent a letter to the assistant city attorney who was handling Mucha's claim for disability benefits. See Mucha Aff. Ex. C. It appears that, by the date of this letter, the ERS had determined that Mucha qualified for disability benefits but a dispute remained over the retroactive portion of those benefits. After discussing the dispute about retroactivity, Fuchs again discussed Mucha's claim against the ERS for violation of § 51.30:

> His (city doctor) report from Dr. Feinsilver was sent to IAD. They then used it to pick him up, and place him in commitment status for four days, on November 20, 2012. Whether or not there is a medical privilege issue, there is certainly an invasion of privacy issue, followed by four days of false imprisonment in a mental ward.
>
> I have told him that if he can get his retroactivity, and something for the four days, to take a pass on suing and fighting with the City for the next couple of years.
>
> If the [disability benefit] can be calculated to November 5 for retroactivity, and he is paid $25,000 for the alleged false imprisonment, a full release would

> be available for this individual. Is there anyone with whom I might discuss this?

Mucha Aff. Ex. C. Mucha contends that this letter satisfies the requirements of § 893.80(1d)(b). To satisfy those requirements, a notice must (1) identify the claimant's address; (2) contain an itemized statement of the relief sought; (3) be submitted to the city clerk; and (4) be disallowed by the city. DNR, 184 Wis. 2d at 197–98. Two principles guide a court's determination of whether a notice of claim is sufficient under subsection (1d)(b). First, "the written claim must be definite enough to fulfill the purpose of the claim statute—to provide the municipality with the information necessary to decide whether to settle the claim." Id. at 198. Second, "notices of claim should be construed so as to preserve bona fide claims." Id.

The defendants contend that Fuchs's letter of July 23rd does not satisfy subsection (1d)(b), but they do not develop an argument as to why it does not. See Reply Br. at 15 n.18. And it appears to me that the letter substantially complies with those requirements. The letter contains the address of Mucha's attorney, see DNR, 184 Wis. 2d at 198 (stating that claimant's attorney's address is equivalent to claimant's address for purposes of the notice of claim statute); it states a specific dollar amount; and it was sent to a city attorney, see id. at 199–200 (stating that claimant satisfied requirement of presenting claim to city clerk by presenting it to city attorney). Moreover, the city disallowed the claim by not acting on it within 120 days. Wis. Stat. § 893.80(1g). Therefore, I conclude that Mucha has complied with the notice-of-claim statute.

As an alternative ground for dismissing Mucha's claim under § 51.30, the ERS argues that the claim is barred by the immunity from claims for intentional torts conferred

by Wis. Stat. § 893.80(4). However, § 51.30(9) provides that a cause of action for unlawful disclosure of mental-health records may be brought against a state or a political subdivision of a state even if the violation was willful. Thus, to the extent that a violation of § 51.30 qualifies as an intentional tort, immunity under § 893.80(4) does not apply.

### 3. Claim for abuse of process against the ERS

Finally, Mucha alleges that the ERS committed the state-law tort of abuse of process when Allen disclosed Dr. Feinsilver's report to the police department.[5] However, abuse of process is an intentional tort, and therefore this claim is barred by the immunity for intentional torts conferred by Wis. Stat. § 893.80(4).

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion for judgment on the pleadings is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted to the extent that the plaintiff's claims against the City of Milwaukee for unreasonable seizure and false imprisonment, his claim against Bernard Allen, and his claim for abuse of process against the ERS are dismissed. In all other respects, the motion is denied.

**IT IS FURTHER ORDERED** that the defendants' motions to seal (ECF Nos. 22 & 27) are **DENIED**.

Dated at Milwaukee, Wisconsin, this 18th day of November, 2014.

            s/ Lynn Adelman
            _____
            LYNN ADELMAN
            District Judge

---

[5]Mucha brings his abuse-of-process claim against the ERS only; he does not bring that claim against Allen. See Pl.'s Br. at 25–26.